# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No.: 1:17-CR-00047 |
| | ) | |
| DARRICK MATTHEW SELLERS | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POSITION ON SENTENCING

On April 19, 2017, Darrick M. Sellers (hereinafter referred to as "Sellers") pled guilty to one (1) count of Receipt of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (b). Considering Sellers' background, his acceptance of responsibility, his commitment to treatment and recovery; a sentence no greater than the mandatory minimum of five (5) years is sufficient, but not greater than necessary, to comply with the purposes enunciated by Congress in 18 U.S.C. § 3553(a)(2).

## BACKGROUND

Sellers was born on February 7, 1980, in Harrisburg, Pennsylvania. He is the second of two children born to the union of Gary Sellers and Flo (née Ferster) Hummel. Sellers remembers that his parents struggled in their marriage when he was around 12 years old, and they eventually separated when he was approximately fourteen years old. After their divorce, his mother married Bruce Hummel and his father married Dolly Sellers. Sellers said that he has a good relationship with his step-father, Bruce Hummel. His older sibling, Kimberly Sellers, resides in Shippensburg, Pennsylvania with her two daughters and works as a school teacher.

Gary Sellers, his father, suffered from mental health illness. According to Sellers, his father's mental health issues were undiagnosed and severely impacted his parents' marriage. In addition to the mental problems, Sellers reported that his father was physically abusive towards his mother. Sellers stated that he has not seen or spoken with his father since he was twenty years old. According to Sellers, the deterioration of their relationship was due, in part, to his father's mental health issues. Sellers remembers his father often talking to himself out loud, running around the house in his underwear singing Christian songs, and struggling with communication. Fortunately for Sellers, his mother and he had an overall positive relationship even though she was not overly affectionate.

While Sellers did not have a good relationship with his father in his early childhood, he was very close to his paternal grandfather. Sellers spent a lot of time with his grandfather until the latter was killed in an automobile accident. Sellers was four years old when the tragic accident happened. This news was devastating to the family, particularly to Sellers and his father. Sellers recalls that his grandfather's death exacerbated his father's mental illness.

Additionally, the marital problems in the home when Sellers was growing up also affected Sellers tremendously. Even at twelve years old, Sellers had difficulties making it to the bathroom on time without accidents. At nights, he had difficulty controlling his bladder and he was still wetting his bed; something that most children around that age are able to control. When Sellers was around the age of twelve, his father was involuntarily committed to a hospital because of his mental health issues. His mother filed for divorce

soon thereafter. Sellers remembers that his bed wetting problem stopped almost immediately.

Sellers attended Fayette Elementary School from Kindergarten to sixth grade. He received good grades and was a good student throughout. Sellers did not want to change school and decided to stay with his father after his parents separated. When he lived with his father, he attended East Juniata Secondary School from seventh to tenth grade. However, Sellers very soon regretted his decision to live with his father. According to Sellers, living with his father was unbearable. Sellers described his time with his father as a bad situation which was largely due to his father's ongoing mental illness. Sellers said that his father's home was unclean, untidy, and there was not enough food. According to Sellers, his father's mental health issues worsened throughout the time that Sellers lived with his father. Finally, he moved back with his mother where he stayed until college.

Sellers attended Selinsgrove Area High School. Throughout high school, Sellers was a good student and he participated in football, and track and field. He remembered staying involved in sports mainly because his family loved sports even though he was not very athletic. Sellers also worked part-time in construction. While he was active in sports and worked part-time, Sellers did not have many friends and felt like a loner. Nonetheless, Sellers obtained his high school diploma in 1998 with a 3.0 grade point average. He attended Pennsylvania State University-Hazleton from 1998 to 2000, and then transferred to Pennsylvania State University-Harrisburg from 2000 to 2002 where he completed his undergraduate degree in mechanical engineering with a 3.2 grade point average.

During his undergraduate studies, Sellers recalls that his relationship with his father further deteriorated. When Sellers was younger, his father promised to help him pay for his higher education; however, his father failed to deliver on that promise when Sellers was enrolled in college. This was the ultimate breaking point for Sellers and his relationship with his father.

While in college, Sellers began dating around the age of nineteen. He remembered that his first relationship was serious. He dated his first girlfriend, a twenty-four year old for two-and-a-half years. Their age difference ultimately caused the relationship to end. Sellers was very vulnerable at the time because he had broken up with his first girlfriend, he was not speaking with his father, and he was quickly approaching graduation with no job prospects. This led to many suicidal thoughts and severe depression. Sellers remembers feeling as if things were piling up quickly. Sellers, at his lowest point, contemplated suicide. Fortunately, Sellers did not feel strong enough to actualize his suicidal thoughts.

Despite his struggles, Sellers continued on to graduate school. Two years later, he obtained a master's degree in engineering with an impressive grade point average of 3.8. Sellers worked at Heery International in Landover, Maryland for a year as a contract estimator. In 2014, he began working at Skanska USA as a construction estimator until 2017. He said he enjoyed learning the construction field.

At the age of twenty-eight, Sellers had his second serious relationship. Unfortunately, the relationship lasted about a year because his girlfriend left the United States to work in Afghanistan. In 2012, Sellers met Thien-Kim Le who would become

his wife in 2016. They have a positive relationship and Kim remains very supportive of her husband.

Sellers' use of pornography was an unhealthy way to cope with years of severe depression. Through therapy and treatment with Dr. Ronald Weiner and Dr. Ronald Boggio, Sellers realized the harm his actions caused and he has taken full responsibility. Sellers is ashamed of his behavior and he recognizes the impact his actions continue to have on the community and his family.

Sellers has been incarcerated since April 2017. Though he continues to struggle with depression, Sellers continues to make himself productive while incarcerated. Over the last several months, Sellers has read as much as possible and just recently became the jail's GED tutor. His responsibilities as tutor require him to be available to inmates in need of help in various subjects. Sellers said that he helps primarily with math; however, he now has inmates requesting his assistance outside of the GED program. As needed, he helps with writing and other matters in their lives. This job has been incredibly rewarding for Sellers because he is able to give back and help people around him. Sellers desires to continue to teach and help at any facility he is transported to after his sentencing.

## ARGUMENT

### I. Legal Standard

Taking into account all of the factors listed in 18 U.S.C. § 3553(a), a district judge must "impose a sentence sufficient, but 'not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18

U.S.C. § 3553(a)) (emphasis added). The factors for the District Court to consider include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect: the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense, to afford adequate deterrence to the defendant and others; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). A district Court must weight each of these factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to 3553(a). *Id.*

## II.     A Sentence of Five Years Is Sufficient But Not Greater Than Necessary To Comply With The Purposes Enunciated By Congress Under § 3553(a)

### i. Nature and Circumstance of the Offense

The facts of this case are straightforward. On or before May 1, 2015, Sellers installed peer-to-peer software on his laptop and desktop computer. While at his residence in Arlington, Virginia, Sellers knowingly utilized the peer-to-peer software on the laptop and desktop computer to download images associated with child pornography. The downloaded images remained solely on his computer. Sellers did not intend to traffic in, or distribute the images that he downloaded. When confronted by the Government, Sellers confessed his guilt. With professional assistance through years in therapy, Sellers understands his wrongful actions and he continues to express remorse.

Sellers is a hard-working man. He lived with severe depression that was not diagnosed until 2015. Through the ups and down of living with depression, he managed to study engineering, a very difficult and rigorous field. He also excelled in college and graduate school. Despite his progress in life and his ability to work and provide financially for himself and his family, Sellers could not escape the demons that lived inside of him. As a coping and escaping method, he began to use and access materials that have pornographic images involving children. When law enforcement went to his house on May 1, 2015 and found that he was watching pornographic images, it did not take Sellers a long time to figure out that he needed help.

Sellers sought treatment from a well-known and competent professional, Dr. Ronald I. Weiner (hereinafter referred to as "Weiner"), who has evaluated hundreds of child pornography offenders over the last fifteen years. Weiner began treating Sellers from May 2015 until April 2017 with the assistance of Elizabeth Raeder, a Clinical Associate. Weiner treated Sellers for almost two years. Sellers met with Weiner bi-weekly for individual forty-five minute treatment sessions, and Sellers also attended weekly ninety minute group treatment sessions. According to Weiner, Sellers was "prepared for each individual session" and "worked hard on all assignments provided to him from the sex offender workbooks." *See* Attachment A, Dr. Weiner's report at 2.

The treatment program was divided into two phases: the intensive phase and the aftercare phase of treatment. The intensive phase contained ten modules. The modules

are divided into units and each unit has a specific goal and objective. In the program, the sex offender examines in detail the circumstances that led to committing the offense, learns to accept responsibility, and learns to manage his behavior by adopting coping strategies to prevent relapse.

The intensive sex offender treatment helped Sellers understand the depth and extent of his problem with pornography. According to Weiner:

> Sellers has accepted full responsibility for his offense conduct. He is now better able to understand the depth and extent of his problem with pornography, which he used as a way to escape his depression and anxiety, and which also, resulted in his going to sites that provided him access to pornographic material involving children. He recognizes that his downloading such material constituted a violation of the law and recognizes that his actions were in the service of the indirect sexual abuse of children.

*See* Attachment A, Dr. Weiner's report at 1.

As a specialist who treated hundreds of child pornography offenders, Weiner believes that Sellers accessed the child pornography sites out of curiosity, on impulse, or for short term entertainment. According to Weiner, Sellers was a mere "recreational user" who was "not involved in networking with other offenders and did not employ security strategies to avoid detection." *See* Attachment A, Dr. Weiner's report at 1, 2. In addition, Weiner noted that the treatment sessions with Sellers showed no evidence of pedophilic interests. Sellers, himself, denied sexual interest in prepubescent children, according to Weiner. The treatment sessions also focused on helping Sellers develop an effective understanding of empathy for the victims forced to participate in degrading and abusive filming of sexual acts. Sellers understands the reality of his actions and expressed genuine feelings of shame and remorse regarding his actions.

As a specialist who is very familiar with child pornography offenders, Weiner "do[es] not consider Mr. Sellers to be a high end offender involved with pedophilic individuals or in trading child pornography to amass a collection." *See* Attachment A, Dr. Weiner's report at 3. Weiner believes Sellers was "an isolated offender whose use of pornography had become increasingly more problematic over time." *Id.*

Sellers was able to successfully complete parts of the intensive program. Weiner's overall impression is that Sellers is committed to completing the full treatment in a satisfactory manner. Weiner also expressed interest in continuing to work with Sellers for an additional ten months of intensive treatment, followed by six months of aftercare after his preparation of a viable relapse prevention plan.

In addition to the intensive treatment with Weiner, Sellers was also evaluated by Dr. Ronald Boggio (hereinafter referred to as "Boggio"), a licensed clinical psychologist and certified sex offender treatment provider. The evaluation with Boggio focused on psychosexual risk factors relevant to recidivism. For his findings, Boggio considered Sellers' developmental and family history, education, employment, mental health, history of substance use/abuse, dating and sexual history, and criminal history. The tests performed were a mental status examination, a standardized psychological instrument, and the Minnesota Multiphasic Personality Inventory – second edition (NMPI-2).

On the basis of the evaluation, Boggio concluded that Sellers met clinical criteria for Persistent Depressive Disorder (Dysthymia). Boggio noted that:

> … individuals with a diagnosis of Persistent Depressive Disorder can be at high risk for suicide at various times in their lives especially during periods of increased stress. This caveat is especially true in Mr. Sellers case for, while he currently has stated that he has no plan to harm himself and has reasons to live, both his distal and more immediate history of suicidal ideation indicate the need

for ongoing assessment of his risk of harming himself as the disposition of his
legal case proceeds.

*See* Attachment A, Dr. Boggio's report at 9.

According to Boggio, Sellers started to experience depressive symptoms as a child and

the symptoms progressed into his adolescence causing him to actively consider suicide.

*Id.* at 9. Like Weiner, Boggio agrees that Sellers sought to escape his depression by

using pornography. Boggio also believes that Sellers should be given the opportunity to

complete treatment with Weiner's group to further mitigate Sellers' risk for committing

any future sex offense. *Id.* at 10. Boggio also proposed to "monitor Mr. Sellers for any

increased suicidal ideation following the disposition of his case and throughout any

period of incarceration that he may serve." *Id.* at 10.

During his examination, Boggio analyzed whether Sellers Attachmented signs of

*Pedophilic Disorder* or *Hebephilic Disorder*. From a clinical perspective, pedophilic

disorder is the term used for individuals who are aroused by prepubescent minors.

Hebephilic disorder is the term used for individuals who are aroused by pubescent

minors. On the basis of his evaluation, Boggio concluded that Sellers does not meet

clinical criteria for either Pedophilic or Hebephilic Disorder. *Id.* at 10. Boggio further

states that, "While he [Sellers] admitted to viewing and downloading images of

pubescent and prepubescent minors, he has consistently maintained that he was only

aroused by images of post-pubescent minors." *Id.*

Additionally, Boggio assessed Sellers' risk of sex offender recidivism. During

this evaluation, Boggio considered Sellers lack of criminal history for his findings.

Boggio relied on recent studies of child pornography offenders relating to the risk of

recidivism. The studies show that offenders are at a very low risk for committing any type of future sex offense, including future child pornography offenses except:

> child pornography offenders who have been found to have a history of previous sexual or nonsexual criminal offending, as these individual show higher rates of sexual offense recidivism than do those child pornography offenders without such prior criminal history. (Seto & Elke, 2005; Seto, 2009; Faust, Renaud & Bickart, 2009; Babchishin, Hanson, & Hermann, 2011).

*Id*. at 10.

Boggio further noted that:

> Mr. Sellers has no criminal history aside from the instant offense and is therefore believed to be a very low level of risk for engaging in any future sexual offense. Additionally, given the fact that there is no evidence to suggest any history of Mr. Sellers even considering a hands-on sexual offense against a child, he appears to present negligible risk for such an offense in the future.

*Id*. at 10.

Based on the reports and the evaluations by Weiner and Boggio, Sellers still needs to complete the intensive sex offender treatment. Sellers also needs to receive medical treatment for his depression. However, Weiner and Boggio both agree that Sellers is a low risk repeat offender for child pornography in the future. They further agree that Sellers does not show any intentions to produce or distribute child pornography. He sought treatment from professionals for the past two years. Both doctors agree that Sellers has accepted responsibility for his actions, he has shown remorse for the victims, and he remains committed to receiving treatment.

Sellers is not perfect, but he is certainly not a villain either. He was a productive member of society prior to his arrest. He went to college, and he kept employment despite struggling with his inner demons and undiagnosed depression for years. His friends and family stood by him to show their support when they learned about his

wrongful actions. A total of twenty-two letters were written by friends and family, and each one shows how Sellers is a kind, caring, loyal, and trustworthy person.

His wife, Kim Le said that Sellers is "the most loving kind-hearted man I have ever met, and I still count myself lucky that God led me to him." Attachment B (a), *Letter from Kim Le*, at 1. She also adds that Sellers "blames himself regularly" and he "talk[s] frequently about wanting to help others when he gets out." *Id.* at 2. Sellers' mother, Flo Hummel wrote that Sellers "feels shame for what he got involved in, but I still love him and am proud of him even more now if that's possible because of how he is taking the blame for the conviction. He's owning up to it." Attachment B (b) *Letter from Flo Hummel*, at 3. Sellers' friend, Hoang Vu, affirms that Sellers is "absolutely remorseful for what he did and is spending the rest of his life regretting and trying to think of ways to make up for his past." Attachment B (d), *Letter from Hoang Vu.* Vu also adds that Sellers is "a reliable resource family and friends can depend on, genuinely cares for others, works hard, and keeps to himself without bothering anyone." *Id.* His friend, Laura Wade, said that Sellers "spoke about receiving medical treatment for his depression as well as regular therapy sessions" and "seemed committed." Attachment B (l), *Letter from Laura Wade.* His friend, Jessica Nevins, says that "Those that know Darrick best are writing letters like my own to express our feelings of love and support for him. We are by his side now, and we'll be there when he has served his time." Attachment B (e), *Letter from Jessica Nevins.*

Sellers spent over two years in therapy addressing his issues. He is horrified by his actions. He is despondent when he thinks of what the victims in this case have been through. On his own effort, he began the process of rehabilitation well before his

incarceration. Twenty-two letters are written by friends and family showing their support of and care for Sellers. All of these factors speak volumes of Sellers' character and the unlikelihood that he will commit a similar offense in the future.

### iii. *Need for Just Punishment and General Deterrence*

A sentence of five years is a severe sentence. It is particularly harsh for someone like Sellers, who has no prior criminal record. It will impress upon Sellers and others the seriousness of his offense.

Furthermore, the period of incarceration is not the only punishment Sellers will receive for his crime. He also faces pervasive post-release restrictions on his liberty and the social consequences of being listed on the sex-offender registry. Every child pornography offender who receives any amount of imprisonment must receive a mandatory minimum five-year term of supervised release (and could receive up to a lifetime of supervision). 18 U.S.C. § 3583(k). Additionally, Sellers is now subject to the Sex Offender Registration Notification Act ("SORNA") and must register as a sex offender in every jurisdiction in which he is convicted, employed, resides, or attends school, and must report to the authorities regularly. Even if Sellers receives the statutory minimum of five years and five years post-release supervision, he will endure multiple levels of punishment, intensive supervision, and social restrictions for many years. These punishments, in addition to five years of incarceration, are sufficient to send a message of deterrence to the general public and to punish Sellers for his conduct.

Given Sellers' background, his acceptance of responsibility, and his commitment to recovery, a sentence of five years is appropriate in this case. Such a sentence would be

sufficient, but not greater than necessary to comply with the purposes enunciated in 18 U.S.C. § 3553(a)(2).

## CONCLUSION

WHEREFORE, for the reasons stated above, the Defendant DARRICK MATTHEW SELLERS, respectfully asks the court to impose a sentence of five (5) years. Additionally, Sellers asks the court to recommend that he be designated to Federal Medical Center Devens so he may continue to receive treatment. In the alternative Sellers asks the court to recommend a designation to Federal Correctional Institution Allenwood so his family may visit him without undue hardship.

Respectfully submitted,

DARRICK SELLERS
By Counsel

PATRICK ANDERSON & ASSOCIATES, P.C.

_____/s/_____

Patrick N. Anderson, Esquire
Virginia State Bar No.29195
Counsel for Defendant
333 North Fairfax Street, Suite 310
Alexandria, Virginia 22314
(703) 519-7100
panderson@pnalaw.com

## CERTIFICATE OF SERVICE

I, hereby certify, that on the 16th day of October, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:


Alexander Patrick Berrang
U.S. Attorney's Office (Alexandria)
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700


PATRICK N. ANDERSON & ASSOCIATES, P.C.:


_____/s/_____
Patrick N. Anderson, Esquire
Virginia Bar No. 29195
Counsel for Defendant
333 N. Fairfax Street, Suite 310
Alexandria, Virginia 22314
(703) 519-7100

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No.: 1:17-CR-00047 |
| | ) | |
| DARRICK MATTHEW SELLERS | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S LIST OF ATTACHMENTS

1. Attachment A- Reports from Dr. Ronald I. Weiner, Ph.D. and Dr. Ronald M. Boggio, Ph.D.

2. Attachment B - Character Letters in Support of Sellers

    a. Kim Le, Wife

    b. Flo Hummel, Mother

    c. Dianna Colyer, Aunt

    d. Hoang Vu, Friend

    e. Jessica Nevins, Friend

    f. Sabrina Aponte, Friend

    g. Kharod A. France, Friend

    h. Soojin Cahill, Friend

    i. Bryan Cahill, Friend

j.  Jason Arisco, Friend

k.  Angela Kim, Friend

l.  Laura Wade, Friend

m.  Asim Walia, Friend

n.  Vianne Le, Friend

o.  Tony Pereira, Friend

p.  Virginia Hoang, Friend

q.  Christina Hoang, Friend

r.  Dung Hoang, Wife's Aunt

s.  Soo Ryun Kim, Friend

t.  Kim Ha, Friend

u.  Ha Le, Friend

v.  Yoshiki Semba, Friend

# ATTACHMENT A



# Ronald I. Weiner, PHD, LLC

Ronald I. Weiner, Ph.D., LCSW-C
Executive Director
801 Roeder Road, Suite 425
Silver Spring, Maryland 20910
Tel: 301-949-4907
Fax: 301-585-8740
www.rweinerphdllc.com

February 5, 2017

Mr. Patrick Anderson
Anderson & Wooditch, PC
333 N. Fairfax Street, Suite 310
Alexandria, VA 22314

Re: Derrick Sellers

Dear Mr. Anderson:

The purpose of this letter is to provide you with a treatment progress report on Mr. Derrick Sellers, who you referred for intensive sex offender treatment following his becoming the target of possible criminal charges for possession of child pornography in the United States District Court for the Eastern District of Virginia.

Mr. Sellers began individual treatment services with me on December 29, 2015. Since that time, I have met with him bi-weekly for individual forty-five minute treatment sessions, and he has attended weekly ninety minute group treatment sessions as well. His treatment progress to date has been satisfactory with no evidence of resistance on his part to treatment concepts or methods.

Mr. Sellers has accepted full responsibility for his offense conduct. He is now better able to understand the depth and extent of his problem with pornography, which he used as a way to escape his depression and anxiety, and which also, resulted in his going to sites that provided him access to pornographic material involving children. He recognizes that his downloading such material constituted a violation of the law and recognizes that his actions were in the service of the indirect sexual abuse of children. To date, I have no reason to believe that he was involved in the production or distribution of child pornography. He impresses me as being a recreational user. Such

users "access child pornography sites on impulse, out of curiosity, or for short-term entertainment. They are not seen to have long-term problems associated with child pornography use (The Problem of Child Pornography on the Internet, Richard Wortley and Stephen Smallbone; Center for Problem-Oriented Policing, Number 41, Problem-Specific Guides Series, Community Oriented Policing Services, U.S. Department of Justice, 2010)."

Mr. Sellers also impresses me as best fitting the psychological typology of child pornography users known as being a browser. Such offenders "stumble across child pornography but knowingly save the images. They are not involved in networking with other offenders and do not employ security strategies to avoid detection. Their browsing is an indirect abuse of children (A Typology of Online Child Pornography Offending, Trends and Issues in Criminal Justice, Australian Institute of Criminology, July: 2004)."

Mr. Sellers has progressed in treatment to date, and appears open to the treatment process. He is prepared for each individual session and has worked hard on all assignments provided to him from the sex offender workbooks we use in our program.

Of initial concern to me was the serious blunting of his emotions which prevented him from expressing his emotions in ways that were healthy such that he would be in a position to use treatment services to his best advantage. He was often depressed, dejected, sad, withdrawn, and expressed suicidal thoughts due to his shame and recognition that he had allowed himself to fail to demonstrate his responsibility to show regard for the well-being of children by his participation in viewing child pornography images and videos. In addition, he had isolated himself and was keeping his situation hidden from his family and his then girlfriend by not sharing with them the extent of his pornography problem and his potential for criminal prosecution charges levied against him. Based on my clinical recommendation, Mr. Sellers sought out psychiatric care, and is now under the care of a psychiatrist. He is currently taking psychoactive medication to treat his depression and anxiety. He has agreed to seek out mental health counseling to help him cope more effectively with his depression and anxiety. Medication has enabled him to better utilize his involvement in treatment with me as well as participate in group more effectively.

I have seen no evidence of pedophilic interests during the course of treatment sessions held with Mr. Sellers to date, and he has denied sexual interest in pre-pubescent

children. We have not subjected him to rigorous physiological testing by having him complete a penile Plethysmograph (PPG) to determine the degree and diversity of his sexual arousal patterns whether normal or sexually deviant in terms of having sexual arousal to children. He has also not taken a visual reaction time test to determine if he shows evidence of having specific sexual interest in children. Completion of such testing would definitively determine if he has pedophilic disorder or that it can be ruled out.

Treatment has also focused on his developing an effective understanding of victim empathy for the plight of the children forced to participate in degrading and abusive filming of sexual acts perpetrated upon them. Mr. Sellers shielded himself from doing so when he was involved in downloading sexually explicit images and videos of children. He has since come to terms with the reality of his actions expressing genuine feelings of shame and remorse regarding his actions.

Our clinic has evaluated hundreds of child pornography offenders over the course of the last fifteen years as a sex offender treatment program vendor to the United States Probation Office (Maryland and the District of Columbia) as well as being a vendor for the Federal Bureau of Prisons. We are very familiar with these types of cases and the offenders who commit them. Dr. Weiner and I do not consider Mr. Sellers to be a high end offender involved with other pedophilic individuals or in trading child pornography to amass a collection. He was an isolated offender whose use of pornography had become increasingly more problematic over time.

Please note that our treatment program consists of two phases, the intensive phase of treatment and the aftercare phase of treatment. Mr. Sellers will be required to complete all of the following ten treatment modules used during the intensive phase of treatment. To date he has successfully completed modules 1, 2, 3, 4 and 8 of our program. He is currently working with me on components of treatment modules 5, 6, and 7.

*Intensive Treatment Phase Module 1*
*Treatment Goals and Objectives:* Completed/Satisfactory
- o **Why Am I Being Required to Attend Treatment?**
- o **Why Change?**
- o **Am I Resistant To Change?**
- o **Am I Motivated To Change?**
- o **What's Required of Me to Change?**
- o **What Can I Get Out of Treatment?**

- o Identifying Targets of Behavioral Change Supportive of Criminal Behavior Generally and Sexual Offending Specifically
- o Learning to Express Needs in Unhealthy and Healthy Ways
- o Negative Self Esteem and Positive Self-Esteem
- o Emotional Intelligence
- o Values Clarification
- o Negative Emotional States as Triggers for Sex Offending Behavior
- o Identifying my Positive and Negative Sources of Support
- o Identifying my Positive and Negative Relationship Patterns
- o Identifying my Negative Communication Methods
- o Negative Self Talk
- o Understanding Anger and Resentments and Their Role in Sex Offending Behavior
- o Understanding the Role of Impulsivity in Sex Offending Behavior
- o Risk Taking and The Failure to Protect the Self From Danger

*Intensive Treatment Phase Module 6*
*Understanding Your Behavior:* In Progress
- o Understanding of the Thoughts and Feelings that Led to My Sexual Offense
- o Understanding My Pre-Offense Pattern and Offense Cycle
- o Understanding Compulsions and Addictions
- o Understanding How Deviant Fantasies Fuel Sex Offending
- o Assessing the Strength of Deviant Attractions
- o Pornography
- o Types and Patterns of Sexual Offenses
- o Planning, Grooming, and Scheming Behaviors
- o Maintenance Behaviors
- o Identification of Common Justifications Used In Sex Offending

*Intensive Treatment Phase Module 7*
*Relationship and Communication Skills:* In Progress
- o Understanding Relationships
- o Relationship Failures
- o Awareness of Self-Defeating Styles in Relationships
- o Developing Effective Communication Techniques
- o Learning to Express Feelings
- o Learning how to Listen and Understand Another's Point of View

*Intensive Treatment Phase Module 8*
*Victim Impact:* Completed/Above Average
- o Body Integrity and Boundary Violations
- o Victimology (Targeting)
- o Opportunity
- o Lack of Capable Guardians

- Violation of Boundaries
- Inventory of Emotional Traumas for Victims
- Coercion
- Intimidation
- Violence
- Trauma
- Breach of Trust
- Breach of Duty
- Grooming
- Blaming the Victim
- Minimizing Extent of Abuse
- Secondary Victimization
- Four Poisons That Destroy Empathy (Selfish Urges; Anger; Twisted Thinking and Denial)
- Self-Pity as an Impediment to Empathy
- Self-Absorbed as an Impediment to Empathy
- Self-Disgust and Healthy Shame as a Motivator to Change
- Understanding and Sensitivity to the Effects of Sexual Abuse on Victims

*Intensive Treatment Phase Module 9*
*Managing Your Behavior:* Not yet started
- Coping with Deviant Arousal
- Developing Recognition Skills of Deviant Sexual Thoughts, Feelings, Urges, and Fantasies
- Self-Regulation Knowledge, Methods, and Skills for Management of Deviant Sexual Thoughts, Feelings, Urges, Fantasies, and Behaviors
- Skill Building in Identifying and Managing High-Risk Situations
- Use of Avoidance and Escape Methods
- MAC (Minimal Arousal Conditioning)
- Covert Conditioning
- Arousal Re-Conditioning

*Intensive Treatment Phase Module 10*
*Relapse Prevention:* Not Yet Started
- Understanding the Relapse Process
- Learning to Anticipate and Cope with the Problem of Relapse
- Lifestyle Risk Factors
- Coping Strategies for Daily Living
- Relapse Prevention: Changing Your Lifestyle
- Relapse Prevention: Learning to Stay in Control
- Coping With Deviant Fantasies
- Coping With Internal Triggers
- Coping With Life Stressors
- Coping With Long-Standing Negative Feelings

- o **Coping with the PIG (Problem of Immediate Gratification)**
- o **Meeting Emotional Needs in Healthy Ways**
- o **Building Positive Social Support Network of People Who Will Support Me in Making Healthy Pro-Social Choices**

In addition to the above treatment modules he is working on, Mr. Sellers must complete the following short-term and long-term treatment goals and objectives in a satisfactory manner before he can successfully complete the intensive phase of treatment. Each of these treatment goals and objectives specifically integrate with the above referenced ten treatment modules of our program. These requirements are as follows:

1. Mr. Sellers is able to identify and understand the following three critical pieces of information in order to stay committed to work on remaining offense free: He has the power to choose to offend or not; there are methods that he can learn and use to assist him to remain offense free by making a commitment to work on avoiding re-offense; he will need to practice relapse prevention as a lifetime commitment and use the knowledge and methods he has acquired following treatment on a routine and regular basis). Completed/Satisfactory

2. Mr. Sellers is able to identify and fully understands the definition of relapse prevention, and demonstrates commitment to implementation of the component parts of the definition in his daily life. Completed/Satisfactory

3. Mr. Sellers will prepare a detailed life and family history autobiography detailing his life experiences in his family, both positive and negative, and thoroughly review this with me to learn about problematic dysfunctional family patterns that have affected his psychosocial functioning and character development. In Progress

4. Mr. Sellers will prepare a detailed sexual autobiography detailing his developmental, childhood, adolescent, and adult sexual experiences, both appropriate and deviant, and thoroughly review this with me and his assigned group to learn about problematic patterns related to his sexual development. In Progress

5. Mr. Sellers is able to identify and fully understands his offense cycle and offense pathway. Completed/Satisfactory

6. Mr. Sellers is able to identify and implement methods to intervene and prevent him from entering into his offense cycle. In Progress

7. Mr. Sellers is able to identify and understand the various types of denial that frequently occur among sexual offenders. Completed/Satisfactory

8. Mr. Sellers is able to identify and fully understand the full range of cognitive distortions he used to carry-out (plan), commit, and justify his sexual offense. In Progress

9. Mr. Sellers will demonstrate he is fully committed to correcting and changing the range of cognitive distortions he used to carry-out (plan), commit, and justify his sexual offense. In Progress

10. Mr. Sellers will demonstrate he is fully committed to correcting and changing the full range of his deviant sexual attitudes, interests, and values that have contributed to his deliberate choice and decision to sexually offend via downloading child pornography. Completed/Satisfactory

11. Mr. Sellers will demonstrate that he is able to identify and implement methods to modify his deviant sexual attitudes, interests, and values. In Progress

12. Mr. Sellers is able to identify and fully understand the common types of physical, emotional, and psychological damage that victims of sexual abuse and sexual assault experience during the course of their lives. Completed/Above Average

13. Mr. Sellers will demonstrate continued commitment to completion of all workbook assignments in a timely manner, and completes such assignments in a manner that demonstrates the acquisition of knowledge, methods and skills to avoid reoffending behavior. Excellent Progress to date

14. Mr. Sellers will demonstrate commitment to avoid engaging in maintenance behaviors that promote and reinforce the prospects of his entering into his offense cycle. In Progress

15. Mr. Sellers will demonstrate that he is maintaining all treatment requirements and is avoiding any and all high-risk situations. In Progress

16. Mr. Sellers is able to understand that use of pornography represents a continuation of efforts on his part to remain in his offense cycle by objectifying others as mere sexual objects for his self-indulgent pleasure, without regard to these persons as individuals. Excellent Progress to date

17. Mr. Sellers will demonstrate that he is committed to avoid any and all use of pornography or other video materials of any kind that objectify others as sexual objects and demonstrate long-term abstinence from use of pornographic materials. He has self-reported that he has not viewed pornography since he began treatment. He has not taken a maintenance polygraph to verify his self-report abstinence.

18. Mr. Sellers is able to identify and understand his unique high-risk situations and is fully committed to using this knowledge to avoid or escape such situations. In Progress

19. Mr. Sellers is able to identify and understand how to effectively use avoidance and escape methods properly as a means of avoiding re-offense or accusatory situations. Excellent Progress to date based on self-report.
20. Mr. Sellers will seek out mental health treatment to help him develop coping strategies for his depression and anxiety. Not Yet Completed
21. Mr. Sellers will continue to work with me work on enhancing his self-esteem in ways that are healthy. In Progress
22. Mr. Sellers will demonstrate that he is committed to developing a positive resource support network of individuals from his family, church, and friend network who will be knowledgeable about his offense and treatment plan and will assist in holding him accountable in his efforts to change. In Progress
23. Mr. Sellers will prepare a comprehensive and detailed Relapse Prevention Plan. The Relapse Prevention Plan will detail the **specific information and knowledge** acquired by him during the course of his treatment (Part 1) from the various treatment methods he has been exposed to (individual, group, conditioning, workbook(s), other assignments); and the **specific methods and skills** that he intends to use to implement that information and knowledge on a continuous basis to avoid re-offense. Not Yet Started

Following successful completion of the intensive phase of treatment, Mr. Sellers will enter the aftercare phase of treatment, requiring that he report back to the clinic for a period of six months, by attending one individual and one group treatment session each month to review his progress or difficulty adhering to his relapse prevention plan.
In addition to the above work cited, Mr. Sellers has moved forward with completion of all workbook assignments provided to him from the two workbooks we use at our clinic including the *Adult Relapse Prevention Workbook* and *Building a Better Life; A Good Lives Self-Regulation Workbook*

Mr. Sellers has made satisfactory progress to date and has completed five of the ten treatment modules, and many of the short-term treatment goals and objectives identified in his treatment performance plan and contract. He appears to accept the need for treatment, and is committed to completing his treatment in a satisfactory manner. I estimate that he will require an additional ten months of intensive treatment, followed by six months of aftercare, following his preparation of a viable relapse prevention plan for approval. In the event that he is formally charged by the Government, we would like to be allowed to continue working with Mr. Sellers in the community and would ask that the Government allow him the opportunity to finish his treatment sessions in the community rather than being detained.

Please let me know if you have any further questions about Mr. Sellers progress in treatment, or what additional requirements he will be expected to complete at our clinic under my care and direction.

Sincerely,

*Elizabeth Raeder*

_____

Elizabeth Raeder, MSW, LCSW-C
Clinical Associate
ATSA Clinical Member
National Organization of Forensic Social Work (Full Member)
Maryland License 14511

Reviewed and Approved by:

*Ronald I. Weiner*

Ronald I. Weiner, PhD, LCSW-C
Executive Director
ATSA Clinical Member
National Organization of Forensic Social Work (Full Member)
Maryland License # 00133
February 6, 2017



**RONALD M. BOGGIO, Ph.D.**
Clinical, Forensic, Consulting Psychology
254 N. Washington Street
Falls Church, Virginia 22046

Telephone: (703) 597-4827

## Forensic Psychological Evaluation
## Sex Offender Evaluation

## I. Identifying Information

| | |
|---|---|
| Name: | Darrick Sellers |
| Date of Birth: | 02/07/80 (Age 37) |
| Marital Status: | Married |
| Date of Report: | 06/07/17 |

## II. Referral Information

Darrick Sellers, a 37-year-old single white male, was referred for a forensic psychological evaluation by his attorney, Patrick Anderson. Mr. Anderson asked that the evaluation focus on psychosexual risk factors relevant to recidivism.

## III. Background Criminal Information

Mr. Sellers has pleaded guilty to one count of Receipt of Child Pornography.

## IV. Statement of Non-Confidentiality

Mr. Sellers was informed of the purpose of the interview, testing, and subsequent evaluative report, and further informed that the results of the evaluation would be communicated to his attorney and, upon recommendation of his attorney, may be made available to the office of the United States' Attorney and the United States District Court. Mr. Sellers indicated his understanding of the limited confidentiality attached to the evaluation, and consented to participate.

## V. Sources of Information

1. Clinical interview and testing with the defendant, Darrick Sellers, 06/23/15, 05/01/17
2. Telephone interview with Flo Hummel, defendant's mother, 05/09/17
3. Telephone interview Kim Sellers, defendant's wife, 05/09/17
4. Telephone interview with Ronald Weiner, Ph.D., CSOTP, Mr. Sellers' sex offender therapy provider, 05/11/17
5. Telephone interview with Elizabeth Reder, LCSW-C, Mr. Sellers' sex offender treatment provider, 05/23/17
6. Statement of Facts, United States v. Darrick Matthew Sellers, by Dana J. Bonte, United States Attorney, undated but signed by Mr. Sellers
7. Discussions with Mr. Anderson

## VI. Developmental and Family History

Mr. Sellers was born to the then-intact union of Gary Sellers (born in 1947) and Flo Hummel (currently 63 years old). Ms. Hummel reported that there were no complications during her pregnancy and that the defendant was delivered normally and without incident. Mr. Sellers has one older sister, Kimberly (currently 41 years old), who lives with her two daughters (ages 6 and 2) in Pennsylvania. Both of Mr. Sellers' parents had been employed as aides for the mentally handicapped during his younger years. Mr. Sellers reported that his parents began having marital difficulties when he was approximately 12 years old and divorced when he was 14/15 years old. His mother later married Bruce Hummel, and his father married Dolly Sellers. Mr. Sellers explained that his parents' marital problems appeared to stem from undiagnosed mental health issues experienced by Gary Sellers. He indicated that, while never involuntarily committed to a mental health facility, his father spent 1 to 2 months in such a facility when Mr. Sellers was approximately 10/11 years old. He recalled that his father often "talked to himself out loud, ran around the house in his underwear singing Christian songs" and also had difficulty with communication, but noted that these problems never seemed to interfere with his work. Mr. Sellers reported that, following his father's hospitalization, his mother "could not really deal with [his father] any longer."

Mr. Sellers described an overall good relationship with his mother while growing up, although he indicated that in his early years, she was "not the type to hug and kiss a lot." He added that, since he has become an adult, they "now hug goodbye." He also indicated that his mother was "not so much" someone he could talk with while he was growing up. Mr. Sellers stated that he had not seen or spoken with his father since he was 20 years old. He said, "I always knew he had problems and that it was difficult to maintain a relationship with him." He added that, after his parents remarried, his father had agreed to assist him in paying for his graduate education but then later changed his mind without any explanation and this incident "was the last straw" in terms of Mr. Sellers' willingness to remain connected with his father. Ms. Hummel confirmed that Mr. Sellers' father had not followed through on his previous promise to help his son with college expenses. Mr. Sellers also described a positive relationship with his sister, noting that he spoke with her by phone approximately once every two months and that the two saw each other several times a year. Mr. Sellers was born in Harrisburg, PA and grew up there until his college years. In 2003 he moved to Maryland and in 2014 he moved to Arlington, VA.

Mr. Sellers recalled "problems going to the bathroom" while he was growing up, explaining that he had difficulty "making it to the bathroom" before soiling himself, but noted that this problem was resolved by age 12. As a child he recalled lying somewhat frequently and also reported once stealing a few baseball cards from an open pack. He reported that he did not continue to lie into his teenage years, and denied any problems with fighting, fire setting, property destruction, staying out all night overnight without parental permission or running away from home as either a child or adolescent. Ms. Hummel confirmed that her son "wet the bed" until about age 12, but said that he presented with no serious discipline issues as either a child or adolescent. She reported that the defendant was very close with his paternal grandfather, and spent a lot of time with him during his early years since both of his parents worked. Ms. Hummel indicated that her son's grandfather was killed in an automobile accident when Mr. Sellers was 4 years old, and

while stating that this had a "devastating" effect on the whole family, including appearing to be the source of her then-husband's emotional problems, it seemed to have a particular effect on Mr. Sellers. She described him as somewhat of a loner throughout the remainder of his childhood and adolescence. He eventually developed a close friendship with a high school peer, but his friend was also killed in an automobile accident about two years after both boys had graduated from high school, and Ms. Hummel stated that she thought this had also had a "devastating" effect on her son.

## VII. Education History

Mr. Sellers attended Fayette Elementary School from kindergarten through the sixth grade and East Juniata Secondary School from the seventh through the tenth grade. He graduated from Selins Grove High School in 1998 with a grade point average around 3.0. He changed high schools following his parents' divorce and the decision to live with his mother. Ms. Hummel told the undersigned that, initially the plan was for Mr. Sellers to continue to live with his father following the divorce so that he would not have to change schools, but that Mr. Sellers had asked her if he could live with her instead. While in high school he was involved in football and track and field. He reported no school-related disciplinary problems and indicated that he never skipped school. Ms. Hummel confirmed that her son never experienced any school -related disciplinary issues.

Mr. Sellers attended Pennsylvania State University (PSU)-Hazleton from 1998 through 2000, and then completed his education at PSU-Harrisburg in 2002, graduating with a bachelor of science degree in mechanical engineering and a grade point average that he recalled as "either 3.1 or 3.2." He later completed a master's degree in engineering science in 2003 at PSU-Harrisburg while achieving a GPA of 3.8.

## VIII. Employment History

As a teenager, Mr. Sellers began working part-time in construction and continued in this capacity through college. From 2003-2010, he was employed by Heery International, while from 2010-2011 he was employed by Skanska. He returned to his former employee for a year but then returned again to Skanska, where he was continuously employed from 2012 through 2017. He left the company as a result of his current legal situation. All of Mr. Sellers' employment has been in the field of construction estimation. He indicated that his move to Skanska in 2010 was the result of "looking for a better opportunity and an expansion of duties," and said that his return to Heery in 2011 was due to the fact that there was a "good mentor" at that company from whom he wanted "to learn the electrical side" of the business. However, he indicated that the mentoring did not work out because the individual did not have enough time to spend with Mr. Sellers and he had an opportunity to return to Skanska, where there turned out to be "better opportunities." At the time he discontinued his employment, Mr. Sellers held the position of Pre-construction Manager. He reported that he has never been the subject of an employment-related disciplinary action, nor has he ever been fired from a job.

## IX. Medical History

Mr. Sellers medical history is unremarkable. He reported that he was in "good" health and took no prescribed medication. He also said that he has never experienced a head injury.

## X. Mental Health History

Mr. Sellers reported a history of paternal psychiatric problems that apparently had their onset in the death of his paternal grandfather (cf. **VI. Developmental and Family History** for further details). Prior to seeing Dr. Weiner and Ms. Reder for sex offender treatment (cf. **XVII. Sex Offender Treatment** below), Mr. Sellers had never consulted with a mental health professional. While in treatment with these providers, Mr. Sellers first became aware of his own history of depression and was encouraged to seek psychiatric consultation for potential medication management. As a result, he was prescribed Lexapro, and indicated that it has helped with his depression. Through treatment, Mr. Sellers became aware of a predisposition to depression that arose out of his father's psychiatric history and pinpointed the origin of his own depression to his childhood and early adolescence. He indicated that he had difficulty experiencing a sense of belonging both with peers and in his own family, due to the fact that his athletic prowess never approached that of his sister and some cousins. However, he never attributed these feelings to depression until his current therapy provided him an opportunity to more deeply examine his mental health issues.

Mr. Sellers also reported a period of several months when he was 21/22 years old when he actively entertained suicidal ideation and some plans for how he might commit suicide. He explained that "college was finishing up and [he] had no great job prospects" and he had also just broken up with his first girlfriend. He said, "Things were piling up pretty quickly." He indicated that at the time he had a gun, but was concerned that his attempt would not be successful so he "began to look at tall buildings," although he felt they "might not be high enough" to lead to his death. He said that he ultimately found an eight-story building and went up onto the roof of the building approximately three times but ended up "scaring [himself] into not doing it." He said, "I just knew I couldn't do it." Finally, he indicated that his overall situation changed for the better when he found his first job and his suicidal ideation ended, again leading him to give no further thought to depression as a more pervasive problem.

## XI. Substance Use/Abuse History

Mr. Sellers indicated that he has no family history of substance abuse. He reported that he first drank alcohol at the age of 18, and said that his use of alcohol from then through age 21 consisted of drinking "a handful of times per year." He did say that on those occasions when he drank he consumed "a lot," which he further specified as "six beers and some cocktails." Mr. Sellers indicated that, beginning at age 21, his drinking pattern consisted of "very very occasional" social drinking on those occasions when he went out with friends and would consume "a beer or two." In the last three or four years, he stated that he typically consumed a glass of wine with dinner if he was out with friends, something that he indicated occurred approximately once per week.

Mr. Sellers reported once smoking marijuana when he was 20 years old, but indicated that he had neither used nor experimented with any other illicit drug.

## XII. Dating and Sexual History

Mr. Sellers reported that he began to date when he was approximately 19 years old. Since then he has had three serious relationships. His first relationship began at age 19 when his then-girlfriend was 24 years old. He stated that they dated for approximately 2 ½ years, but broke up primarily due to their age difference. He explained, "I was still in college and she was a professional looking for a family and maybe somebody a bit more mature." He indicated that his second serious relationship began when he was 28 years old and his then-girlfriend was 25/26 years old. They dated for approximately a year and broke up when "she took a job that sent her to Afghanistan." Mr. Sellers' third serious relationship is with his wife, Kim (currently 29 years old). They met in 2012 and were married in 12/16. Both Mr. Sellers and his wife reported a positive relationship and she is fully aware of his charges. She also confirmed that Mr. Sellers has gotten in touch with his history of depression as a result of his current treatment. In addition to these three relationships, all of which were sexual in nature, Mr. Sellers reported an additional 5-10 sexual partners. He said that least half of them were with women he was casually dating and the other half were "more like one night stands."

Mr. Sellers reported that he began to masturbate at the age of 12, and indicated that the frequency of his autoerotic activity as an adolescent was "daily at least." In his early adult years he also reported masturbating "close to daily," but noted that in the last 5 to 10 years he engages in this activity approximately two to three times per week. Mr. Sellers also reported first seeing anything that might be considered pornography at the age of 12. He explained that this was one of the *Police Academy* movies, and noted that it only included nudity. He indicated no regular use of pornography as a teenager, and stated that he first began viewing Internet pornography while he was in college. He reported that this began in the university computer laboratory when a few times a week he would look at pornography online and masturbate at times when no one else was in the room. He recalled having to stop this activity "a few times" when someone came into the room, but said that he was never caught masturbating or looking at pornography nor was that ever his intention in engaging in these activities in the computer room. Rather at that time he did not own his own computer. After graduating from college he reported "close to daily" viewing of Internet pornography on his home computer after work. He said that he spent approximately an hour looking for/at pornography while masturbating. He explained that part of that time he was "just searching for something that would be a turn on," and that part of the time he might also be "watching television or just stopping looking at pornography." Mr. Sellers also reported that, from 2010 until police involvement in the instant offenses, his pornography viewing had been "slowly decreasing" to the point where it averaged 30 minutes of viewing approximately three times a week.

Mr. Sellers told the undersigned that his Internet pornography viewing began with heterosexual adult content, but noted that "the first time [he] saw" child pornography pictures was in college when he was in his early 20s. He indicated that, from that time until his arrest, his viewing of

child pornography was "somewhat consistent" and that he was intentional about looking for this type of pornography. He said that the images he looked at included "generic modeling sites," some of which were foreign, but that he eventually became involved in file-sharing networks and viewing more explicit images. He reported that some of the material he downloaded he would immediately erase, while other files he would save for a few months. He also indicated that he used eMule and Limewire as his primary file-sharing programs, and that he simply stored any downloaded pornography in the download folder resident in those programs and did not further sort the material. He also stated that he "tended to look at new stuff rather than returning to the saved" material. He reported that his erotic preference when viewing child pornography was in postpubescent youth, which he described as showing breast development and pubic hair. While admitting to having observed younger images, he stated that he only masturbated to the images of older teens.

Mr. Sellers was asked what he thought was arousing to him about the child pornography. He said that in part it was because "it was like a different thing – something taboo." While he never had a period of time in which he completely discontinued his use of all pornography, he stated that there were "weeks in a row" when he refrained from looking at child pornography because he "did not feel good about it and knew it was wrong." He stated that he has never entertained sexual fantasies about an actual child and was not at all inclined toward any sexual involvement with a child. When asked how he felt currently about his use of child pornography, he said, "absolutely terrible. If I could take it all back I would. It was not something I needed so much as a habit." As a result of his sex offender treatment, he came to realize that his use of pornography – both adult and child images – was a way of "recharging [his] batteries," which had been left depleted by his depression. Involvement in treatment also helped him understand that merely viewing child pornography helped to provide a market for the ongoing abuse of children.

## XIII. Criminal History

Mr. Sellers has no prior criminal history.

## XIV. Instant Offense

### A. Mr. Sellers' Account

Mr. Sellers account of the instant offenses is contained in **XII. Dating/Sexual History** above.

### B. United States' Account

According to the Statement of Facts (SOF) provided by the government to Mr. Anderson, Mr. Sellers had downloaded from the Internet "images of minor children depicting the lascivious display of genitals, sexual intercourse, masturbation and/or sadistic or masochistic abuse." The SOF referenced images depicting "such things as naked, prepubescent female children performing oral sex on an adult male, an adult male inserting his penis into what appears to be a prepubescent female's anal and vaginal area, and an adult male having sexual intercourse with a female child whose legs are bent and spread apart and her wrists are duct taped to her legs."

Finally, the SOF indicated that some of the images depicted were of children "under the age of 12."

## XV. Tests and Actuarials Administered

Mental Status Examination
Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2)

## XVI. Test Results

Upon mental status examination, Mr. Sellers presented as a left-handed, 37-year-old White male who appeared to be his stated age. He reported that he was 6' 1" tall and weighed 185 pounds. He was casually but appropriately dressed and well groomed. Greeting and eye contact were appropriate and his demeanor was friendly. He was cooperative throughout the interview and testing process. Gross balance/coordination and fine motor skill/coordination were adequate and gait was unremarkable. His activity level was average and he was free of tics, repetitive behavior and either psychomotor agitation or retardation. Speech speed, quantity, articulation and prosody were all within normal limits, and he was able to sustain a conversation without difficulty. He was alert and fully oriented to person, place, time and circumstances. Attention, concentration, registration and both immediate and delayed recall were all within normal limits. Intellectual functioning, while not formally assessed, appeared to be in the average range based on vocabulary use and fund of information. Brief screening revealed no evidence of organic involvement. Memory functioning was intact and abstract thinking was evident. Speed of thought processes was average and there were no apparent problems in thought production. Thought flow was logical/sequential, thought process was clear and there was no evidence of delusional thinking, paranoid ideation or ideas of reference. He denied auditory and visual hallucinations and there was no evidence that he was responding to internal stimuli or experiencing psychotic symptoms. Mr. Sellers' affect was somewhat constricted but congruent with thought content. Mood was somewhat depressed. He denied homicidal ideation, but during his initial meeting with the undersigned reported ongoing suicidal ideation since the instant offenses came to light. He said that both the intensity and frequency of these thoughts have decreased over time, noting that he would have rated them as 7/8 on a 10-point intensity scale initially, but that in 06/15 he would rate their intensity as 5 out of 10. He also said that initially the thoughts occurred daily but then occurred only a few times a week. He further stated that he had no active plans associated with harming himself, stated that he no longer owns a gun and, even after being prescribed psychotropic medication, did not consider using it to kill himself via an overdose. He stated that he had told his current therapists and psychiatrist about these thoughts and that he was regularly assessed with respect to their intensity/frequency. Finally, he reported that his family is a strong reason for his remaining alive. He reported no problems with either sleep or appetite. By the time of his second meeting with the undersigned, he reported no significant suicidal ideation. Broad social judgment and insight were both mildly impaired.

Standardized psychological instruments such as the MMPI-2 produce profiles based on the statistical probability of a match between the test taker and a segment of the reference group of individuals known as the standardization sample, upon which the instrument is normed. As a

result, profile descriptions are not meant to be an absolute description of the test taker, but rather serve to raise hypotheses, which must be tested against other sources of data that are examined in the course of conducting a psychological evaluation. Mr. Sellers approached the MMPI-2 in a straightforward manner with no apparent attempt to engage in either positive or negative impression management. Such individuals tend to have an objective appraisal of their positive and negative traits. As a result of the validity scale configuration, his MMPI-2 results can be taken as an accurate indicator of his current level of psychological functioning. Individuals with similar validity scale configurations are socially introverted, shy and experiencing significant dysphoria. They tend to feel anxious and uncomfortable in social situations. Lacking in self-confidence, they can be easily embarrassed. As a result they do not enjoy being involved with groups or crowds of people. They are likely to feel unhappy, blue or depressed much of the time and may experience themselves as inferior and useless, lacking the energy to cope with everyday activities. They may also be pessimistic and hopeless and have recently been preoccupied with thoughts of death and suicide.

## XVII. Sex Offender Treatment

Mr. Sellers reported that he began sex offender treatment with Dr. Weiner and associates in May 2015 and continued in treatment until April of this year when he was incarcerated. He indicated that he was seen in group treatment weekly and in individual treatment every other week. Mr. Sellers stated that he had "learned a lot about" himself and the origin of his depression while in treatment, and how he had used pornography as a way of dealing with his depression because it "at least for a time made [me] feel better." He added, "I was able to set aside my life and go with pornography to distract myself." Although Mr. Sellers had reported already at the time of his initial interview with the undersigned on 06/23/15 that he knew looking at child pornography was wrong, he indicated that he had a better understanding after his involvement in treatment of both what led him to use pornography to manage his mental health needs, as well as the way that child pornography contributed to the ongoing abuse of children.

Dr. Weiner and Ms. Reder were both involved in Mr. Sellers' group treatment, while Ms. Reder served as his primary individual therapist. Dr. Weiner confirmed that Mr. Sellers began treatment on 05/13/15 and continued in treatment until 04/12/17. He further confirmed that treatment consisted of weekly group treatment and every other week individual treatment, stating that Mr. Sellers regularly attended his sessions. Ms. Reder confirmed that Mr. Sellers reported masturbating only to postpubescent images, but admitted to having viewed and downloaded younger children at times. Both therapists indicated that Mr. Sellers was able to become more involved in treatment after he began taking medication for his depression, and Dr. Weiner stated that Mr. Sellers' use of pornography appeared to be a coping strategy for a lifetime of untreated depression. Furthermore, his therapists indicated that he accepted full and complete responsibility for his use of child pornography and did not attempt to minimize his arousal to postpubescent images. They also individually indicated that it took a while for Mr. Sellers to become convinced that the use of child pornography played a role in ongoing child abuse. However, they stated that, as he progressed in treatment, he became fully convinced of this and saw how his behavior contributed to this ongoing abuse.

## XVIII. Diagnosis (DSM-5)

300.4        Persistent Depressive Disorder (Dysthymia)

On the basis of this evaluation, Mr. Sellers meets clinical criteria for Persistent Depressive Disorder (Dysthymia). The essential clinical characteristics of this disorder are ongoing periods of depressive symptomatology for a period of at least two years, and this evaluation has revealed that Mr. Sellers began to experience depressive symptoms as a child/adolescent, and had a previous period in his 20s, when the symptoms led him to actively consider suicide. This diagnosis is also supported by the results of standardized psychological testing. Currently, his depression appears to be fairly well-managed through the use of psychopharmacology and the insights he has gained from treatment, however, he does continue to experience depressive symptoms (which he rated as 7 on a 10-point scale) and it is important to realize that **individuals with a diagnosis of Persistent Depressive Disorder can be at high risk for suicide at various times in their lives especially during periods of increased stress. This caveat is especially true in Mr. Sellers case for, while he currently has stated that he has no plan to harm himself and has reasons to live, both his distal and more immediate history of suicidal ideation indicate the need for ongoing assessment of his risk of harming himself as the disposition of his legal case proceeds.**

The scientific literature classifies children/adolescents according to stages in terms of their pubertal development. *Prepubescent* minors are those individuals who have not yet entered puberty and show no signs of pubertal development. In contrast *pubescent* minors show the initial stages of pubertal development but have not yet developed full sexual maturity. Finally, *postpubescent* minors evidence adult sexual development. From a clinical perspective, individuals who are aroused by prepubescent minors are said to exhibit signs of Pedophilic Disorder and individuals who are aroused by pubescent minors are said to exhibit signs of Hebephilic Disorder. While sexual behavior between adults and postpubescent minors is illegal, from a clinical standpoint, adults who are attracted to postpubescent minors are not considered to exhibit signs of a mental disorder since these minors evidence adult-level sexual development. On the basis of this evaluation Mr. Sellers does not meet clinical criteria for either Pedophilic or Hebephilic Disorder. While he admitted to viewing and downloading images of pubescent and prepubescent minors, he has consistently maintained that he was only aroused by images of postpubescent minors.

## XIX. Sex Offender Risk Assessment

While actuarial tools for the assessment of the risk of sex offender recidivism are the preferred method for assessing risk in such cases, the most well researched actuarial instruments in the sex offense domain (e.g., Static-99R, Static-2002R) are not appropriate for the assessment of child pornography-only offenders, as such individuals were not a part of the standardization sample for those instruments. However, the scientific literature has produced a number of recent studies of child pornography offenders that help shed light on issues related to the risk of recidivism. The overwhelming conclusion of these studies is that, on the whole, child pornography-only

offenders are at a very low risk for committing any type of future sex offense, including future child pornography offenses. The only exception to these conclusions is in the case of child pornography offenders who have been found to have a history of previous sexual or nonsexual criminal offending, as these individuals show higher rates of sexual offense recidivism than do those child pornography offenders without such prior criminal history (Seto & Elke, 2005; Seto, 2009; Faust, Renaud & Bickart, 2009; Babchishin, Hanson, & Hermann, 2011[1]). Mr. Sellers has no criminal history aside from the instant offense and is therefore believed to be at a very low level of risk for engaging in any future sexual offense. Additionally, given the fact that there is no evidence to suggest any history of Mr. Sellers even considering a hands-on sexual offense against a child, he appears to present negligible risk for such an offense in the future.

## XX. Summary, Conclusions and Recommendations

Darrick Sellers, a 37-year-old single White male, has pleaded guilty to one charge of Receipt of Child Pornography. He was referred for a forensic psychological evaluation by his attorney, Patrick Anderson, who asked that the evaluation focus on psychosexual risk factors relevant to recidivism. On the basis of this evaluation, Mr. Sellers was found to meet clinical criteria for Persistent Depressive Disorder (Dysthymia), but was not found to meet clinical criteria for any disorder of sexual deviance. In addition, he was found to be at very low risk for committing a future child pornography offense and of negligible risk for committing a hands-on child sex offense.

Over the course of his treatment, beginning more than two years ago, Mr. Sellers has become aware of a long and persistent history of depressive symptomatology, from which he sought to escape at times through the use of pornography. It is important that he has begun psychopharmacological treatment for his depression and he has also made significant gains in sex offender treatment, which will serve to further mitigate his risk for committing any future sex offense. It is recommended that he be given an opportunity to complete his treatment with Dr. Weiner's group pending the disposition of his criminal case. As noted above, **it will be important to monitor Mr. Sellers for any increased suicidal ideation following the disposition of his case and throughout any period of incarceration that he may serve**.

*RMBoggio PhD*

Ronald M. Boggio, Ph.D.
Licensed Clinical Psychologist
Certified Sex Offender Treatment Provider

[1] Seto, M.C. & Elke, A.W. (2005). The criminal histories and later offending of child pornography offenders, *Sexual Abuse: Journal of Research and Treatment, 17*(2), 201-210.
Seto, M.C. (2009). *A Picture is Worth a 1000 Words: What We Know about Child Pornography Offenders.* Presented at Conference of the Association for the Treatment of Sex Abusers. Dallas, TX.
Faust, E., Renaud, C. & Bickart, W. (2009). *Predictors of Reoffense among a Sample of Federally Convicted Child Pornography Offenders.* Presented at Conference of the Association for the Treatment of Sex Abusers. Dallas,TX.
Babchishin, K.M, Hanson, R.K., & Hermann, C.A. (2011). The characteristics of online sex offenders: A meta-analysis, *Sexual Abuse: A Journal of Research and Treatment, 23*(1), 92-123.

# ATTACHMENT B

August 21, 2017

Your Honor,

I am Darrick Seller's wife and I am writing to tell you a little about my husband. There are just some things court documents cannot tell you about a person, so I hope that this letter will give you a little more insight into who he is as a person.

We met five years ago through an online dating website. When I first met him, he was extremely shy, timid, and nervous, but I also sensed in his eyes kindness, compassion, and vulnerability. Darrick suffers from depression and self esteem issues, and because of that he doesn't easily open up to people. However, if you take the time to get to know him, you'll find a beautiful, kind, compassionate, sensitive, self-less, giving, thoughtful, and funny human being underneath the quiet demeanor. This is the man that I fell in love with and the man I continue to miss and love every day.

Darrick's had a very hard childhood and young adult life which he doesn't like to talk about or share, but I think it's important for you to know this about him. Darrick comes from a family of incredible athletes (state champions, national competitors, etc) and despite being involved in sports, he did not achieve what his family had hoped for him. He never felt good enough and I think at times felt like he disappointed his family because he could not achieve what his sister, cousins, and aunts achieved. When he was a 13 or 14, his parents divorced because of his mentally unstable father. His mom moved out of the house and his sister left for college that same year. He was left alone in a house for awhile with a mentally ill father who subjected him to a very unstable upbringing. Although he would never say this for fear of hurting his mom and sister, I think he felt abandoned by them during this time. He became very closed off and kept to himself a lot even after he left his father's house. When he moved away to college, his father cut off all contact with him and essentially abandoned his only son for another life. I know this hurt him very much and during this time, he had one childhood friend whom he leaned on for support. Unfortunately, this friend passed away suddenly when Darrick was in his 20s. Darrick still keeps the six pack of beer he last shared with his best friend in our fridge. He is incredibly sentimental and he loves people to depths of his heart.

I think throughout his life, Darrick has felt alone and abandoned by everyone he loves. He told me once "Everyone I love eventually leaves me anyway". Despite all the hurt he's been through in his life, he has never once wanted to hurt anyone else. He continues to show kindness and compassion for others even when he was in pain. However, he is also human and imperfect. The events of his life lead to a deep depression that he kept to himself for many years (even to this day, I don't think his family knows how depressed he was). He was alone in a new city by himself (he moved to DC after college) and had no one he felt he could lean on, so he turned to porn and video games to escape from his pain and feelings of abandonment. He has admitted to me that he has contemplated suicide during his darkest hour. When he found out about this legal situation, he told me to leave him so that I could have the life he couldn't give me.

I know that life would be easier if I moved on (and he would understand), but I chose to marry Darrick and stand by him because he is worth every tear and hardship that I know I will have to face in the years to come. He is the most loving kind-hearted man I have ever met, and I still count myself lucky that God has lead me to him. He loves me unconditionally, and has always

supported me and believed in me at my lowest. I have never met anyone who has so selflessly loved and cared for me or others as my husband. Plus, he still makes me laugh even during hard times.

My niece and nephew are my life, and if for a second I thought he would harm them in any way, I would not hesitate to put him away. But Darrick is the most gentle person I know, and I know he would never hurt any one, much less a child. Since we don't have any children, Darrick and I treat our nieces and nephew like our own. When I see my 4 year old niece these days, she continues to ask "Where's Uncle Darrick? Can we go to Monkey Joe's again?". My heart breaks every time she asks about him.

We had plans this year to get married in Greece, buy a home, and start a family together. I have cried and prayed every day for our family and I still mourn for the life we'll never have. I am in my 30s and I know that I may never get to be a mother, but I pray and hope that we can still have a normal life together after all this is over. Darrick blames himself regularly for what his situation has put me and his family through. I know he has a lot to contribute to society, and he talks frequently about wanting to help others when he gets out. I think what he needs most is therapy and purpose, not incarceration. I will accept and respect whatever decision you make, but I hope that you can find it in your heart to show compassion and leniency for my husband and give him chance to do good in this world.

Thank you Your Honor for time and consideration.

Sincerely,


Kim Le

August 21, 2017

Flo Hummel
106 Loyal Dr.
Mechanicsburg, Pa. 17050

Your Honor,

I am Darrick Sellers' mother and my heart is breaking for him and his new wife. I love them both dearly.

I know you have a most difficult job, trying to discern if society is safer with imprisonment and how long the sentences should be, so I want tell you as much as possible about Darrick. I apologize in advance for the length of this letter.

Growing up, Darrick was not a problem child, in fact just the opposite. He got along well with peers and teachers in school. He was on the honor roll in school and was a member of the National Honor Society.

Darrick also was active in sports and he excelled in track and field and also football. He received medals in both sports. Darrick also did well in math and algebra and so it was his desire to go to Penn State to become a mechanical engineer. He also did well in college and went on to get a Master of Science in Mechanical Engineering. He easily got a job after graduating near the Washington D.C. area.

Darrick worked hard and even took on a second part time job so he could buy a condo near where he worked. He later went to another job and bought another condo and rented out the one he still owns. Darrick was very conservative with his spending and we would joke with him as during the winter months, he would keep the temperature down in his condo as he piled on extra layers to keep warm just to save a few dollars.

Darrick actually was near to a perfect child as a parent could have. While he was living in our home, he never got a speeding ticket and never got into drugs or drinking.

Darrick's father and I had marriage problems over the years and we divorced when Darrick was about 14 years old. Darrick's father had some mental and behavioral issues and he ended up in a mental hospital for a short time. This caused the marriage to fail as it became clear that his father was not able or willing to change.

I remember that Darrick never wanted to bring any friends to the house. Darrick did not want his friends to see what his "crazy" dad was like. Then when Darrick went to college, his father refused to support him and did not call or visit him. Darrick has not seen or talked to his father for approximately 18 years. I am sure he feels abandoned and unloved by his father.

Darrick had a couple of close friends in high school, but his best friend was suddenly killed in an auto accident a few years after high school. This friend had married his high school sweetheart and had a 3 month old son. We all were so devastated. Darrick tried to "step up" and be there as he knew his best friend would want him to. Darrick for a few months tried to keep contact with his friend's widow who was also a friend to Darrick. All of a sudden, she broke off all contact as she started to see another guy after only 3 months of her husband's death.

I am telling you this as I believe the loss of his best friend, the rejection of his friend's widow and rejection of his father happening so close together, sent Darrick down a path of depression. He no longer came home like he once did. I'm sure he did not realize what was happening to him and I was also not aware of how deep the hurt he was living with at the time. I feel now that he looked for something to fill the void and hurt in his life. I know Darrick was not aware of the addiction that had started to get a hold of his life.

Darrick did eventually find a lovely girl and had plans to marry when he gave us the devastating news of what he had been involved in. My family's world came crashing down. I have spent many days and nights crying and praying. I even find myself sinking into depression as I think how all the hard work he did and the life he wanted with his new wife might be lost. I know his wife wanted children with my son, but if he must spend many years in prison, she may be beyond childbearing years when he is released.

When Darrick did share with us of what he got involved in, he was more concerned of the hurt he inflicted on me and his new wife than what he was facing himself. When your grown 37 year old son cries on you shoulder and says how sorry he is for disappointing you, you know he has a repented spirit.

I also know Darrick would never hurt or do anything to a child. I know many would say I could not know that for sure. But you see, I was sexually abused as a young teen, so I am quite aware of how someone can "groom" a child. Because of what I went through, I am very aware of anyone becoming too involved with a child. I would not be standing by my son to this degree if I ever saw anything that I thought would hurt one of my grandchildren or any child. I have never seen Darrick do anything that would even put a question in my mind.

I understand you must uphold the law, but if there is a way for Darrick to get probation and community service, it would be a wonderful miracle for our entire family. I feel a long prison term would only cause Darrick to sink deeper into depression. If he could possibly speak to other young people about the addiction to porn, many others perhaps would not find themselves a part of the prison population one day. Education is the key to a lot of our nation's problems I feel. If someone would have talked to Darrick about the devastating effects of porn, I feel he would not be where he is at today. This also would make Darrick grow emotionally to become a valuable part of society.

I know my son feels shame for what he got involved in, but I still love him and am proud of him even more now if that's possible because of how he is taking the blame for the conviction. He's owning up to it.

My heart's desire was always to have God use Darrick for a great service to help others and if somehow this could happen by your lenient judgement, I believe my prayers would be answered.

I thank you in advance for your time, attention and thoughtful consideration to the matter at hand. May God bless you as you try your utmost best to deliver a fair and just judgement.

Respectfully submitted,


Flo Hummel

# Honorable Judge Presiding

**August 20, 2017**

Dianna Colyer

1630 Cocolamus Road

Mc Alisterville, Pa. 17049

Re: Darrick Sellers:

My name is Dianna Colyer, I work as a Manager for Weis Markets. Darrick Sellers is my nephew. He was a guy who was on the honor roll at school growing up, never in trouble at school or the law, went to church with his parents every Sunday and was in a weight lighting program because he was involved in the throwing events in track at a young age through high school.

We are a family oriented, having picnics and holiday gatherings frequently. All sibling, spouses & children attend; even through this is how we got to meet Darrick's soon to be wife. This is how we all can stay in touch with each other. I'm sure Darrick expresses regret of his actions and would like to move forward with his life. For to a request for leniency, I believe that an extended prison term will serve as a tremendous hardship for his wife and family.

Thank you in advance for your help and support to Darrick Sellers in this important time.

**Respectfully your,**

**Dianna Colyer**

Your Honor,

My name is Hoang Vu and I'm a mother of 2 young boys. My family and I have gotten to know Darrick for about 5 years. Throughout those years, we were able to spend time with him and developed a good friendship. As a close friend who's gotten to know him quite well, I've learned that he is a reliable resource family and friends can depend on, genuinely cares for others, works hard, and keeps to himself without bothering anyone. I understand that he's made a horrible mistake but from my interactions with him throughout the years, I don't think it was an in character action. I truly believe that he is absolutely remorseful for what he did and is spending the rest of his life regretting and trying to think of ways to make up for his past. I'm not sure what the process when it comes to his judgement but if you are wondering if he's going to be a problem to society, I can attest that he will not be. To prove how much I stand behind that statement, I want you to know that I still trust him to watch my kids or be around me because I know he will only do his best to take care of them. I'm not saying this because he's a friend but because I know him and I truly believe he's ready to do what it takes to get back any credibility and good standing. I also think that is the reason why his wife and the true friends that actually knows him is still behind him and supporting him to get through this.

Thank you for your time and consideration.

Hoang Vu

Jessica Nevins
6030 Hardwick Place
Falls Church, VA 22041

August 28, 2017

Your Honor:

 My name is Jessica Nevins, and I am writing to you in regards to the defendant, my friend, Darrick Sellers. I have known Darrick for over five years; he is married to my best friend of 20 years, and I trust her judgement of character completely. I consider Darrick to be a hard worker, kind, and humble.

 My knowledge and opinions of Darrick are based upon my own interactions and the private conversations I have had with his wife in the past few years. What I know to be true is he adores his mother, sister, and nieces. As a husband, he is tender, loving, and supportive. He is a hard worker, often working weekends to complete projects and make deadlines. He is good with his money and finances, purchasing two properties by the time he was 36. He is an honest man that decided to be upfront with his family, friends, and coworkers regarding the charges, despite him and his wife losing friendships. He is a good man, and yet he has flaws like all humans do.

 I do not feel that Darrick is a menace to society, and I do not believe a prison sentence is the right form of punishment. I understand the trouble Darrick is in, but also know that since the charges came to light, Darrick has done everything in his power to seek treatment in an effort to unearth the reasons behind his actions, and solace in others facing similar allegations.

 Those that know Darrick best are writing letters like my own to express our feelings of love and support for him. We are by his side now, and we'll be there when he has served his time. I know there will be many letters like mine supporting Darrick, and speaking of his kind heart. I ask that you please read these letters and believe them. I trust that Darrick will always work to be a better man.

Respectfully,
Jessica Nevins

August 24, 2017


To the honorable judge presiding:

Over the last five years, I have had the pleasure of getting to know Darrick Sellers through his wife Kim Le, as she and I have been best friends since middle school. Fortunately, as their relationship progressed and turned to marriage, I have come to know the kind, thoughtful and compassionate person he is. From the start, Darrick brought a light to my friend's life and seeing her happy with him meant that he would be an important person in my life as well.

Living in the Washington, DC area, close to Kim and Darrick, we were able to share a considerable amount of quality time together. Whether just having a meal together, attending a life event for someone in our circle of friends or celebrating a holiday, Darrick is a wonderful person to be around. Though shy, Darrick is the kind of person to remember details shared from passing conversations, to show concern for others and to happily be of help when needed. Each of us has had relocations, ups and downs in relationships, happy occasions to celebrate and difficult occasions to support one another through, and he has been there all along.

As we've shared more of our lives with each other with passing years, Darrick opened up about his struggle with depression. This has been lifelong, as I learned that he faced unfortunate circumstances as a child, which impacted his mental health in adolescence and into adulthood. He completed college and has worked hard at his career in engineering since, though I believe the depression remained a battle. He acknowledged finding it hard to cope, though he sought help and worked towards making changes.

Darrick is a sweet and loving son, brother, uncle, friend and partner to his wife. His presence is painfully missed everyday that he is away. Darrick and all of us who love and support him know that he made grave mistakes, though we also believe in him as a good person who sincerely has and will continue to learn and grow from this ordeal.



Respectfully,


Sabrina Aponte
Sabrina Aponte, Master of Social Work

August 26, 2017

Honorable Judge Presiding,

The purpose of this letter is to offer support for my friend, Mr. Darrick Sellers. I have known Darrick for a little over a year and half and was introduced to him by girlfriend, as he was engaged (they have since gotten married) to one of her best friends. Throughout the course of the last year, I have gotten to spend time with Darrick on a number of different occasions and in this time Darrick quickly grew from simply "one of my girlfriends' friends" to someone who I definitely considered a friend of mine as well.

From my time spent with Darrick I would describe him as a kind, caring, loyal, trustworthy, patient, easy-going guy, who always had kind words to offer and who seemed to always be able to put you at ease whenever you were around him. As I got to know Darrick more and more, it became abundantly clear to me just how much he cares about friends, family and the people close to him and how much they too care about him.

Darrick is a kind hearted and compassionate person and he undoubtedly has the ability to impact those around him as well as society at large in a positive and meaningful way! My hope is that Darrick will be granted this opportunity as well as the opportunity to rejoin his family and friends as soon as possible!

Sincerely,

## Kharod A. France

Kharod France, PhD, LCPC

August 23, 2017

Dear Honorable Judge Presiding,

I am contacting you about my dear friend, Darrick Sellars. I am reaching out to you because Darrick has not only been a very sincere and genuine guy to me and my husband, but also has been an amazing partner to one of my very close friend Kim, whom I met Darrick through. He has always been kind, selfless, and generous from day one.

Darrick and I have been writing letters to each other. I know he is trying to make the best of the situation by participating in classes, reading various books, and working out. He always focused on the positive. I've even talk to him on the phone briefly which amazed me to hear of his positivity and never heard him complaining.

Darrick and Kim mean a lot to me. I have many great memories with Darrick and Kim from celebrating our birthdays together to having an intimate board game night. I have always enjoyed his company and how he gets along with everyone!

I hope you consider this information in regards to the charges Darrick is facing. Whatever the outcome of the trial, I want it to be known that Darrick is an upstanding citizen of this country. Thank you for taking the time to hear my thoughts on this matter.

Respectfully yours,

Soojin Cahill

August 23, 2017

Dear Your Honor,

I am writing a character reference for my friend Darrick Sellers. I first met Darrick through Kim Le, who is one of my wife's closest friends. And naturally, because of the girls' close relationship, Darrick and I would spend a lot of time together, and we became close as well. I have always, from day one, felt and received only the utmost kindness, generosity and sincerity from Darrick. I have never felt any suggestion of indecency in Darrick, which is why I was completely taken aback with the news of Darrick's legal trouble. Darrick was completely open and honest about his situation to me and I respect him greatly for that.

My favorite memory of Darrick was his surprise birthday party that Kim planned for him that coincided with the Super Bowl. His reaction to the surprise was that of somewhat bashful selflessness. He didn't want any focus on himself: he only wanted people to have a good time and enjoy the football game. He, as always, was extremely accommodating and unbelievably generous to the guests, on the one day a year that everyone is afforded some level of selfish attention.

Since Darrick's incarceration, we have been communicating via mail. I have been asking about his living situation and how he is adjusting. Darrick hasn't written one complaint. I haven't read about any frustration or anger. I've been reading about his desire to do good in a bad situation. I've been reading about him wanting to educate those around him. I've been reading about him exploring new books and keeping up with current events. But mostly I've been reading about his concerns for his family and friends. All his thoughts are with his friends and family and his hopes that they are doing well. And not one ounce of me is surprised. That is Darrick.

Respectfully yours,

Bryan Cahill

08/23/17

Honorable Judge Presiding,

I'm writing to you in support of Darrick Sellers. I met Darrick through dating one of his close friends and have known him for over 2.5 years now. I am also close friends with his wife. He's always friendly and extremely thoughtful to everyone he knows. I've never known him to treat anyone with anything other than respect. I truly see him as one of the best people I know in regards to his character.

He's always been a supportive and loving partner and friend. I am sure I am not the only one writing to support him at this time. Darrick always makes a good impression and I believe that the amount of people showing their support and love for Darrick speaks volumes to his character and reputation. Furthermore, he's not one to be negative. I know he's been reading and taking different classes as ways to stay positive and better himself in his current situation.

I ask you in good faith to consider all of this while presiding over his case.

Sincerely,

Jason Arisco

Your Honor:

My name is Angela Kim, and I'm a close and proud friend of Darrick Sellers. I've known Darrick for over five years. I was introduced to Darrick by his then girlfriend, now wife, Kim Le, my friend for almost 15 years. Darrick is an outstanding citizen, and someone that I trust and support.

He is an outstanding samaritan, a humble man, and an empathetic individual. He has always impressed me with his dedication to his loved ones, specifically his mother, sister, his niece and nephew, and his wife, Kim, and her family. He has devoted his entire life to his loved ones, and I know he would never knowingly act or speak to harm, hurt, or distress any individual. As a personal friend, he has been nothing but supportive, gracious, kind, and loving.

I know that he will continue to strive to become the best representation of himself, and to continually make the right decisions. While incarcerated, I know that Darrick has genuinely worked hard to make everyday count, especially through self reflection and with the relationships he has continued with his loved ones. I am impressed by his optimism, clearheadedness, and desire to improve.

I love Darrick very much, and he is an important part of my life. I am proud of his improvements over the past few months, and look forward to his continual growth. I hope that you will be fair in his sentencing, and recognize the good Darrick brings to family, friends, and all who know and meet him. I look forward to the day I can welcome him into my home again.

Thank you,
Angela Kim

Your Honor,

My name is Laura Wade and I am a close friend of Kim, Darrick's wife. I met Kim 14 years ago in college and I've always known her to be a strong-willed, passionate woman with integrity and a lot of heart. I think it's important for you to understand Kim's character, because she believes with all of her heart that Darrick is a good man. I trust Kim, and I've never known Darrick to be anything different.

I first met Darrick about 6 years ago when he and Kim began dating. I noticed right away that Darrick had all of the qualities you would want in your friend's new boyfriend - he was intelligent, a responsible adult, and a very kind person. Over the years, I got to know Darrick better as we went to birthday parties together, met up for double date dinners and even took a few trips together. During that time, I came to know Darrick as an extremely gentle and sensitive soul - never one to raise his voice or say a mean word. I learned that Darrick has been through challenges in his life that would be difficult for anyone to overcome. Through that, I began to recognize and appreciate Darrick's quiet, inner strength, along with his commitment and love for Kim.

Over the last several months, Kim has remained unwaveringly by Darrick's side. I've been impressed by the resolve on both of their parts. Darrick in taking accountability of his actions, and Kim in taking a firm stance that she would be there to support Darrick along the way. Darrick was brave enough to tell a room full of his friends what had happened - no excuses, just a lot of deep remorse and a course of action to get help. Darrick spoke about receiving medical treatment for his depression as well as regular therapy sessions. He seemed committed to putting this behind him and turning his life around. I think in this situation, that's the most you can ask for.

I hope that you can take this into consideration for Darrick's future.

Thank you,
Laura Wade
lawade07@gmail.com
571-355-2745

Your Honor,                                                                8/27/17

I am writing this letter on behalf of Darrick Sellers. Darrick is married to my fiance Laura's close friend Kim Le. I have known Kim for 8 years and have gotten to know Darrick from the time they dated and into their marriage.

Together Kim and Darrick are a great couple. They compliment each other well, as they both have very different personalities. Darrick tends to be shy and more reserved, while Kim tends to be charmingly boysterous. As different as their personalities, they always seems to have a lot of fun together, showing their affection towards one another, and share a high level of respect for eachother.

Darrick's circumstances has obviously put a lot of stress on Kim. Kim could have taken the easy route out and left Darrick after he was charged, but she didn't, and that speaks to her loyalty and character. These days, people treat marriage and commitment as a punchline, but not Kim. Her life got completely turned upside down with Darrick getting charged, but she never hesitated to stay by his side and fight for him. I admire that level of commitment which is rare these days.

I am a person who believes in accountability. I am a firm believer that people need to own up to their actions and face the consequences for their actions. I am also learning that people do deserve second chances and those second chances often turn into great stories of success. I do believe that Darrick takes accountability for his actions several years ago, and I don't believe having him locked up in jail for several years will do anyone any good. Instead I strongly believe that a work release program, massives amounts of community service, and therapy would be a more appropriate punishment for his actions. I believe he has a lot of good in him and if you show him some compassion with this sentencing, I think you will be happy with the amount of good Darrick can achieve.

I am an entrepreneur in the DC metro area. I own several businesses and have hired many people who needed a second chance. Those are some of the best people I have been around. We all need a second chance at one point or another in life.

Please free to contact me with any questions regarding this letter.

Best Regards,
Asim Walia
571-926-3158
asimwalia@gmail.com

Your Honor,

The way I know Darrick is through my cousin Kim, his wife. The first time I met him was at a family gathering at a busy restaurant. My family is quite loud and boisterous so it can be very intimidating. Although it was the first time some of us were meeting him, he seemed like he had a sense of comfort being around our family. Compared to the rest of my family, I am definitely the soft spoken one. In that way, Darrick and I connected and I was able to immediately see the kind soul he has. Over the years, every time I saw Darrick at our family gatherings, he always seemed content. There were multiple times throughout these years where he personally expressed to me that he felt very happy with our family and that we made him feel at home. He is not someone to say these things so lightly or often so each time I heard it (maybe once every two years) it was a reminder of how genuine it was. My favorite quality in Darrick is his abundance of respect. He comes from a completely different background from my cousin and our family. The unknown can be intimidating, especially when it is a culture and language that you are not familiar with. Once again, he always seemed so comfortable. He would share his favorite Vietnamese cuisines, even pronouncing it quite accurately. He was curious to learn more, to do what he could to be a part of our family in a culturally responsive manner. It takes a big heart to genuinely want to learn about and appreciate other people. Darrick means a lot to not only me, but my family. He is a part of our family.

Sincerely,

Viann Le

September 1, 2017

Honorable Judge,

I just want to share what I know about Darrick Seller.

I've got to know Darrick when he came to work for Skanska as a Mechanical Estimator about 5 or 6 years ago, can't remember exactly but, anyway, he's been very professional and demonstrated commitment and dedication not only to Skanska, but also to our Preconstruction Team.  Darrick was always ready to help our team in all the tasks involving our challenges with Conceptual Design, Schematic and Design Development phases of our projects. With his quiet mechanical knowledge and analytical attitude and great relationship with subcontractors, he help me manage estimates and even negotiating with owner with such a calm and poised behavior that is to be admire. Unfortunately due to our so busy work schedule, I didn't have the chance to get to know Darrick in a more personal level, before he left Skanska, Darrick did share that he was struggling with depression, I know all of us have good days and bad days sometime.

I have to say that Darrick and his work ethics, collaboration, positive attitude, problem solving, very poised, professional life is to be admire. He was a great co-worker while working with us here at Skanska and I really wish he could resolve his personal struggles and come back to work with us again someday.

Sincerely,

Tony Pereira

August 23, 2017

Dear Your Honor,

I'm writing to you today to share my thoughts and love for Darrick Sellers. Darrick came into my life a little over four years ago. It was one of our usual family gatherings, full of aunts, uncles, cousins, nieces, and nephews. This time we get to meet my cousin's boyfriend! He was nice, friendly, and willing to try any food we put in front of him. A plus in our book because Asian food can be…interesting. As we got to know each other, I learned that he is a hard worker, caring partner to my cousin, and always willing to participate in our family activities (going to temple, taking the kids to zoo, and helping where ever is needed). He is an integral part of our close knit family. He is family. And loved by all of us, another son to my aunt and uncle, a husband to my cousin, an uncle to the nieces and nephews, and a brother to me. Through these tough times, he has been honest and open, which adds to his already outstanding character.

Warm regards,
Virginia

Virginia Hoang
4800 Nash Drive
Fairfax, VA 22032

Thursday, August 24, 2017

Dear Honorable Judge Presiding,

I am writing you today to share with you my experience with Darrick Sellers.  I met him several years ago during Christmas dinner. The house was bursting with family that night; aunts, uncles, and cousins crowded around tables full of food with nieces and nephews running and screaming with glee.  As I walked in, I quickly ran to greet my cousin and meet her boyfriend, Darrick. He was warm, friendly, and unintimidated by the hoards of aunties asking him questions and shoving food onto his plate. Our family liked him immediately and as the years passed that like grew into love.  At every family function, whether big or small, he has always offered to help in any way he can, whether it was to help move a heavy piece of furniture, run errands, or babysit. Darrick has become a part of our family and his presence has been missed during this time away. Our family was very close prior to this but through Darrick's openness and transparency, our family has become even closer and the love even stronger to provide Darrick and my cousin the love and support they need to navigate these tough times. I hope this has given you a glimpse into our lives with Darrick and what he means to us.

Warm Regards,
Christina Hoang

Dear Honorable Judge.

My name is Dung Hoang aunty in law of Darrick Sellers.

The reason I write this letter because I heard that people said, it can help you to know a little bit more how good for Darrick Sellers, and also because I love them so much, he and his wife my beautiful, lovely, intelligence and good heart niece.

Regardless his mistake, he the one when who ever meet him, should love him right away because he looks handsome, so polite, so nice and helpful to every body.

The day that couples announced there engaged in the father's day, made all family cried and laughed because we were so happy for the beautiful couples. Especially their parents.

Then, we so excited and so busy so happy to plane the Roman White Wedding in Santorini, Greece. Everything seemed like goes on so smoothly the way God wants.

But suddenly they let us know about Darrick problem, first we stand, second, we cried, this time we can't laugh because of a fact of the matter, we sad so sad.

We don't know how to help them go through this matter unless you want to help them.

Please, Honorable Judge, would you do something for them. The young and pride futures couples.

Sincerely yours.

Dung Hoang

August,24 2017

August 22, 2017

Dear Honorable Judge Presiding,

I am writing to you on behalf of Darrick Sellers. I would like to bring a few things to your attention. Darrick has been a friend of mine for over three years. He is a very kind person and would always make an effort to come out to my birthday celebrations or a friend's gathering. He is caring and personable. He genuinely cares about how I am doing. I've also seen first hand how well he treated his family and girlfriend.

I have written to Darrick and he has kept a positive attitude. He has mentioned he has been reading a lot, exercising to stay healthy, and taking classes such as Inner Peace and Art to better himself.

I hope that you consider this information throughout the case.

Sincerely,

Soo Ryun Kim

August 22, 2017

Your Honor,

I met Darrick five years ago when he first started dating his now wife, Kim Le. Kim and I have been very close friends for over 14 years. I have seen Kim through various relationships throughout our friendship and was very happy that she found a match in Darrick, who is honest, kind, and funny. When they decided to get married, I had the honor of leading their ceremony, where I shared some words they had prepared about one another. It is very apparent that their relationship is founded on unconditional love and support.

Darrick is a very nice and kind person. He is loyal, humble, and hardworking. Even though I met him through his wife, Kim, I consider him to be a good friend of my own and hope for the very best for him.

Thank you for taking the time to read my letter.

Sincerely,
Kim Ha

Your Honor,

My name is Ha Le, I am writing on behalf of Darrick Seller. Hopefully that my letter will provide you some insight of Darrick as a person that I know.

I have only known Darrick for about 4 years now. He is my sister's husband. We are not exactly close or hang out often as they do not live close to me, but Darrick rarely misses a family event, small or large. And I'm sure if he lives down the street from me, we would be much closer. Over the years, my observations and impression of Darrick has not once been negative. He has always demonstrated kindness and love to friends and families. And definitely a person that will love and be available, not just for my sister, but for our family, at any given moment.

As you are well aware, he has been battling his situation for over 2 years now, but unknown to all of us, he and my sister has kept the issue a secret as they do not want to worry or trouble us. But when the time finally came, he was willing to come forth with all the facts, and all he asked for is for us to still trust and believe in him, that he is still the good person we have always known.

When he found out that there was nothing more he can do. He told my sister that she should leave him, and does not want her to be alone. This tells me how much he love my sister and she deserves more. From this alone, I have thought of him not as my brother-in-law, as I see and feel no less as if he is practically my biological brother, if that's even possible.

It is unfortunate that this situation has fallen upon him. Darrick has submitted to face the law as it is written for his indirect and, I'm sure, unintentional involvement in the matter. All I hope is that with this simple letter, you will see him as do, a good, kindhearted person, and have mercy and give him and my sister a meaningful future.

Best regards,

Ha Le

To Honorable Judge Presiding;

August 21, 2017

I am writing this letter to describe Darrick Sellers, who I know is a good and kind person based on my relationship with him in the past and present.

How I got to know Darrick goes back to 2000, when both of us started at Pennsylvania State University, Harrisburg campus. I first went to a Mechanical Engineering Technology orientation class. I saw and met several students. After I went back to my apartment, there was Darrick pulling into the same parking lot. As it turned out, I was renting one room and Darrick was renting the room right next door! Majoring in the same degree.

Coming from a different country, getting to know a person like Darrick as a friend while studying abroad by myself gave me mental support and motivation to do better. We continued to develop our friendship through school years. I remember going out to Denny's late at night after our last class, staying there just ordering a cup of coffee until 2/3/4 am while studying, making jokes, venting, and talking about our dreams with one another. This was not a once a month occurrence, but was 2-3 times a week! We spent a lot of time together. These were the most gratifying years. These years established the honest, sincere, hard-working, and over-achieving people that we are today.

At the end of our senior year, we partnered together for our senior project. I was going to pursue my Master's degree in engineering. He came to me asking if he should do the same. I happily suggested that he should and we can take the same classes together as we both had the drive and wanted to achieve higher goals.

After graduating, he took a job in DC, I took a job in NY.  We kept in touch by phone, talking about each other's work, relationship updates, and how life was going in general.  Although not in the same area, we planned to take two major vacations outside of the US; once to Brazil and once to Spain in 2012.

As we have progressed further into life, we both found wives.  He invited us to attend his wedding, which was planned back in May of 2017 in Greece and I intended to ask Darrick to be my best man at my wedding.

As Darrick's friend, I believe he has good morals and, being a good judge in character, I cannot see Darrick committing any crime as serious as this.  With this being said, I feel that this must be a mistake and would sincerely request to reevaluate his sentence.

Sincerely,

Yoshiki Semba